LEIGH M. CLARK, Retired Circuit Judge.
This is a consolidated appeal from judgments of conviction and sentence in two separate and distinct cases. In one case, CC-83-1370, appellant was charged in an indictment with having robbed Ben Sud-deth of one hundred and twenty-eight dollars; in the other case, CC-83-1371, he was charged in one count of the indictment with burglary of the residence of Johnny Johnson and in another count with robbery of Johnny Johnson. The two eases were consolidated on motion of the State. Although the appeal was from the judgments in both cases, appellant presents no issue as to the case in which Mr. Suddeth was the alleged victim. Therefore, we limit our discussion to the case in which Mr. Johnson was the alleged victim.
Appellee agrees, subject to an addendum, that the following Statement of the Facts contained in appellant’s brief is substantially correct.
“On or about April 29, 1983, Johnny Johnson was asleep at his residence when about 2:00 A.M. he was awakened by the sound of a fan falling over in the floor. Mr. Johnson arose from bed and found Jimmy Lee Pinkston squatting behind the refrigerator in his kitchen. Johnson grabbed Pinkston and the two men began to struggle. Pinkston called out the name ‘Slim,’ and a second man entered Johnson’s house by breaking a window out of Johnson’s door and unlocking the door from the inside. The second man aimed what Johnson testified to be a shotgun at Johnson as Jimmy Lee Pinkston ordered the second man to shoot. At no time did either intruder demand property or anything of value from Johnson. In fact, it was Johnson who initiated the physical struggle which ended in ‘Slim’s’ aiming the shotgun at Johnson and Johnson’s subsequent flight from the house.
“Johnson admitted that he was unable to identify Bennett as the man referred to as ‘Slim’ at the court hearing held at Juvenile Court but Johnson did identify Bennett as the second man who entered the house the night in question.
“The only direct evidence that a theft was committed is that Pinkston testified that he took Johnson’s pants.
“Jimmy Lee Pinkston was called to testify on behalf of the State. He testified that he had entered Johnson’s house but denied that Bennett accompanied him. The state attempted to impeach Pinkston on the basis of a prior inconsistent statement which Pinkston made to the police which incriminated Bennett. Jimmy Lee Pinkston denied that the statement offered by the State was his statement. However, the statement was admitted over Bennett’s objection. At the close of all evidence, Bennett moved for judgment of acquittal which the trial court denied.”
In addition to the facts as agreed upon by the parties, we quote the following from the testimony of the alleged victim, Johnny Johnson:
“Q. What happened then?
“A. I went off the way through the whole projects slam across Bell Street to a white lady’s house. I don’t know the address. And, she called the police.
“Q. Okay. Did you ever return to your house?
“A. Me and the police went back over there.
“Q. When you went back to the house, did you have an opportunity to look through your property?
“A. They did let me look through the house.
“Q. Okay. Did you notice if anything was missing at that time?
“A. My blue jeans containing my billfold, driver’s license, money, and car keys were missing.
*410 “Q. And how much money was in there?
“A. Three hundred dollars was in my billfold.

“Q. Okay. Have you recovered any of this property?
“A. I haven’t seen none of it.”
Jimmy Lee Pinkston testified on call of the State. He testified that he was present in Johnny Johnson’s home on the night of the crimes for which appellant was being tried, that he (Pinkston) had been convicted of “robbery and burglary” involving “this very incident.” His testimony as to his participation and as to his conviction continued in pertinent part as follows:
“Q. You plead guilty to that, didn’t you?
“A. Yes, sir.
“Q. As a matter of fact, when you plead guilty to that, you told the judge what happened, didn’t you?
“A. Yes.
“Q. Is it a fact that you told the Judge at the time you plead guilty that Mr. Bennett was with you?
“A. I don’t remember.
“Q. You don’t remember making that statement either, do you?
“A. No, sir.
“Q. As a matter of fact, the reason you don’t remember making any of these statements, Mr. Pinkston, is because you are afraid something is going to happen to you, isn’t that true?
“A. No, sir.
“Q. You are afraid if you fink and that gets around to up there at the penitentiary or something, that something is going to happen to you?
“A. No, sir. I’m not scared.
“Q. Isn’t that the reason you are telling the lie here today?
“A. No, sir.
“Q. All right.
“MR. GUY [Assistant District Attorney]” Your Honor, at this time, we would like to offer into evidence his statement.
“MR. JONES [Defendant’s attorney]: We object. It hasn’t been authenticated.
“THE COURT: Admitted. Objection overruled.
“(WHEREUPON, State’s Exhibit Numbers Two and Three, having been previously marked, were admitted into evidence.)
“MR. GUY: No further questions.
“THE COURT: Cross-examination.
“MR. JONES: I don’t have any questions.
“THE COURT: Okay. Step down. Call your next witness.”
Appellant challenges the admission in evidence of State’s Exhibits 2 and 3 by a short argument that is captioned as follows:
“The Trial Court erred in admitting into evidence Jimmy Lee Pinkston’s statement because the statement was not authenticated and the statement was offered to impeach the State’s own witness.”
Appellee responds in its brief to the quoted contention of appellant by arguing in effect that the only objection of defendant to the introduction in evidence of State’s exhibits 2 and 3 was that the exhibits had not been “authenticated” and that the State’s inquiry of its own witness as to previous statements made by him “was simply making an attempt to refresh the witness’ recollection and allow him to correct his testimony,” and that there is no merit to appellant’s contention that State’s exhibits 2 and 3 had not been authenticated. State’s exhibits 2 and 3 purport to be two pages of a typed “statement taken by A.F. Blankenship, investigator of Jimmy Pinkston,” State’s Exhibit 2 being the first page thereof and State’s Exhibit 3 being the second page thereof. Each page purports to bear the signature of A.P. Blankenship and the signature of Jimmy Pink-ston. We quote the first few questions and answers found in the statement:
“In your own words tell me of the events which took place on 04-29-83.
*411 “We were standing out on the corner there at Bibb Graves. About 2:00 AM me and Slim decided to walk down to Johnny’s house. We went to the back door you know and we opened the back door with a knife. We went in and we seen him sleeping. I kicked the fan over. I went over to the refrigerator and I opened it up and took some beer out of there. I heard him get up out of the bed. When I heard him come out I got over beside the refrigerator and squatted down. First he went into the living room and then he walked into the kitchen. Then he came on into the kitchen and I stood up. He saw me and then he grabbed me by the wrist. When I hollered at Slim he came and Johnny ran out the back door. We ran out the back and I ran no Johnny ran out the back and I ran into the bedroom. Slim ran out the front. I got a pair of pants from up under the mattress. I took the beer and the pants from under the mattress and ran out of the front door. Me and Slim joined up on Bibb Graves and went to 15 Eugene Street.
“Q. Who is Slim that you keep referring to?
“A. I think it is Theo something Bennett. I’m not sure about the first name but his last name is Bennett and they call him Jap.”
The questions and answers on the second sheet, State’s Exhibit 3, are as follows:
“Q. When you took the pants what was in the pants?
“A. 620.00 dollars.
“Q. How much of the 620.00 dollars did you get?
“A. 310.00 dollars.
“Q. Where is the money now?
“A. The money is gone. I spent it. I bought a pair of pants and a shirt down at Dungaree Fashions and I lost the rest in a crap game.
“Q. Did any glass get broke while this incident took place?
“A. The front door window got knocked out when Jap came in when I called him.
“Q. What kind of shotgun did you have?
“A. It wasn’t a shotgun it was a stick.
“Q. Did you use it in such a way as to make Johnson think it was a gun?
“A. I didn’t have nothing. Jap had the stock.
“Q. Do you have anything to add or delete from this statement?
“A. No sir.”
That State’s Exhibits 2 and 3 purportedly signed by Jimmy Pinkston were materially contradictory of the testimony of Jimmy Pinkston is clear. In our opinion, the State was entitled to show that it was surprised by the testimony of its witness and was entitled to show by the witness, if it could do so by admissible evidence, his materially contradictory statement. Prior to the introduction in evidence of State’s Exhibits 2 and 3, the witness had been shown the exhibits and had said that some of it was true and that some of it was not true. In an effort to clarify the situation, the trial court conducted a hearing out of the presence of the jury, in which the witness was given an opportunity to explain or rationalize, if he could, the obvious conflict between his testimony and some of the contents of'State’s Exhibits 2 and 3, which was concluded as follows:
“BY MR. JONES [Defendant’s attorney]:
“Q. Is that statement your statement or was it somebody else’s statement that— and they made you sign it?
“A. I don’t know where the statement — the police statement, where it came from.
“Q. Did you read it before you signed it?
“A. I read it, but all of it isn’t true.
“Q. Did you sign it?
“A. I don’t know where all of that typing came from. Some is added to it or something.
“Q. Did you read it before you signed it?
“A. Yes, sir.
“Q. Is it the same thing that was there when you read it?
*412 “A. Not all of it.
“Q. What is different?
“A. It was different about him coming in the door breaking the window with a shotgun and all of that. That isn’t true.
“Q. What about the part that asks who was with you and you said that it was a guy by the name of Theo, you think, Bennett. They call him Jap. Did you say that?
“A. No, sir.
“THE COURT: Okay. You can cross-examine when he comes back. Let me ask you this: are you saying that you don't remember telling me that Thelonious Lowe Bennett was outside with his shotgun, broke the window, and when you plead guilty—
“MR. GUY [State’s attorney]: Back on the 29th of August.
“THE WITNESS: No.
“THE COURT: All right. Bring the jury back in you can continue examining him.
“THE COURT: Wait a minute.
“(WHEREUPON, the following proceedings occurred outside the presence and hearing of the jury:)
“THE WITNESS: Do I have to say anymore?
“THE COURT: You have to answer the questions that the lawyers ask you.
“THE WITNESS: Well, I have done said all I have to say.
“THE COURT: Bring the jury out.
“WHEREUPON, the following proceedings occurred within the presence and hearing of the jury:)”
Our review of the entire transcript convinces us that the proffer of State’s Exhibits 2 and 3 was subject to the objection made by defendant’s attorney that the particular two-page document “hasn’t been authenticated,” and the trial court was in error in overruling defendant’s objection to such evidence. Nevertheless, whether it constituted error prejudicial to defendant deserves additional consideration, which we now give to the issue.
Before the State rested its case, it called, as a witness, Investigator A.F. Blankenship, the same investigator who had signed State’s Exhibits 2 and 3, which were shown him while he was testifying. With specific reference to the exhibits, he testified:
“Q. Did you have an opportunity to go over that statement with Mr. Pinkston?
“A. Before he signed at the bottom, my personal procedure that I do is before I allow him to sign at the bottom, they have to read the entire statement, they have to agree to it, and then they have to sign at the bottom after reading the statement which says that they hereby affirm that the facts and description are true.
“Q. So you allowed him to go over that?
“A. That’s correct.
“Q. And he signed it at the bottom?
“A. Yes.
“Q. Did you put anything in here that he didn’t say?
“A. I tried as best as humanly possible to type exactly what he told me as he told me.”
During intensive cross-examination, Officer Blankenship said that Jimmy Lee Pinkston, when first apprehended, denied any participation in the alleged crimes but soon thereafter, after his rights had been explained to him, “The statement that you see before you is the story that he gave us at that time.” Although the evidence is not as clear as it should be as to the authenticity of State’s Exhibits 2 and 3, it cannot be seriously questioned that they were authenticated by the testimony of Investigator Blankenship, which cured and made harmless and non-prejudicial the error in overruling defendant’s objection to State’s Exhibits 2 and 3 on the ground that they had not been authenticated.
In the only other issue presented in appellant’s brief, he contends that the trial court “erred in denying” defendant’s “motion for judgment of acquittal on the robbery count in the case in which Johnny Johnson was the alleged victim.” We do not agree with the argument in appellant’s brief to the effect that the threatened violence on the part of this appellant in aiming a shotgun at Johnson was “in order to *413 extricate Pinkston from Johnson’s grasp.” The evidence was sufficient to warrant a finding that this appellant’s conduct in aiming the shotgun at Johnson was also for the purpose and “in the course of committing a theft.” Nor do we agree with appellant’s argument that the fact that “all violence had ceased” at the time of the commission of the theft prevented such violence from meeting the specific requirement of Alabama Criminal Code § 13A-8-43 that to constitute robbery the force of violence exercised or threatened must be “in the course of committing a theft.” The trial court was correct in denying defendant’s motion for a-judgment of acquittal.
The judgments of conviction and sentence in both of the cases under consideration should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All Judges concur.